[Civ. No. 43648. Second Dist., Div. Five. Dec. 23, 1974.]

UNITED CALIFORNIA BANK, Plaintiff, Cross-defendant and Respondent, v.
ELLIOTT MALTZMAN et al., Defendants, Cross-complainants and Appellants.

## COUNSEL

Hill, Farrer & Burrill, Jack R. White and William M. Bitting for Defendants, Cross-complainants and Appellants.

Donnelly, Clark, Chase & Johnson and John A. Donnelly for Plaintiff, Cross-Defendant and Respondent.

## OPINION

**LORING, J.\***—United California Bank (UCB), plaintiff and cross-defendant commenced this action to recover money alleged to be due under a contract, entered into as part of a loan transaction, entitled "Sponsors' Loan Purchase Agreement." The terms of this agreement required Elliott Maltzman, W. E. Robertson, Harold Pollack, Harriette Maltzman, Pearl Robertson and Joyce Pollack (sponsors) to purchase a certain promissory note upon the occurrence of certain conditions precedent.

Saymur Investment Corp., H. D. P. Corp. and E. B. M. Corp., doing business as Santa Clarita Village, a joint venture (joint venture) and sponsors cross-complained alleging that UCB failed to disburse funds promised to be loaned to the joint venture under a "Construction Loan Agreement." After nonjury trial sponsors were found to be liable in the sum of $686,757.83, including principal, interest, and attorneys fees, together with costs of $447.90. The court also found that joint venture and sponsors were not entitled to recover anything from UCB under their cross-complaint. Sponsors and joint venture appeal from the entire judgment.

### CONTENTIONS

Joint venture, as cross-complainant, and sponsors, as defendants,

---

*Assigned by the Chairman of the Judicial Council.

contend that:

I UCB's refusal to disburse funds for the construction of on-site improvements constituted a material breach of contract and failure of consideration, excusing sponsors from any obligation to perform under Sponsors' Loan Purchase Agreement, and entitling joint venture and sponsors to recover damages on their cross-complaint.

Sponsors, as defendants, contend on appeal that:

I Joint venture was not in default and the conditions precedent to sponsors' obligations under Sponsors' Loan Purchase Agreement did not occur.

II UCB failed to tender an assignment of the promissory note and deed of trust to sponsors and thus sponsors are not obliged to pay UCB the sum demanded.

III Sponsors were in fact the principal obligors under the promissory note, and Code of Civil Procedure section 726 bars suit against sponsors unless the security for the loan is exhausted.

IV If Sponsors' Loan Purchase Agreement is to be regarded as a true guarantee creating a separate obligation from the secured debt, sponsors were entitled to require UCB to proceed first against joint venture and the security as a prerequisite to asserting liability on their part and they are exonerated to the extent UCB failed to do so.

V The interest computed by UCB and awarded by the court is plainly excessive and contrary to the terms of the governing instruments.

## FACTS

In 1966, sponsors Elliott Maltzman and Harold Pollack entered into negotiations with Robert Hamer of UCB for a possible loan for the development of a parcel of land. Sponsors sought financing for the construction of single family dwellings. The tract of land was then owned by Halell Corporation, which was owned by Maltzman and Pollack. There were 73 residential lots in the tract, including 6 lots that were improved with model homes.

Hamer made an independent credit investigation of Halell Corp., Maltzman and Pollack. Cost estimates were submitted by Maltzman

regarding off-site improvements (grading, curbing, gutters, sewers, storm drains and utilities) and on-site improvements (actual dwellings).

On March 16, 1967, UCB approved a loan of $1,273,000. to Halell to be personally guaranteed by Maltzman, Pollack, and their wives. But just prior to the actual consummation of the loan, a joint venture was formed, known as Santa Clarita Village, to carry out the development in lieu of Halell Corp. The joint venture acquired ownership of the tract from Halell Corp. The joint venture consisted of three corporations: Saymur Investment Corp., described as W. E. Robertson's Corporation, E. B. M. Corp., whose officers were the Maltzmans and H. D. P. Corp., whose officers were the Pollacks. Robertson was brought into the joint venture because of his building experience and substantial personal wealth which might be needed by the joint venture. Hamer testified that, with the exception of Saymur Corp., the financial condition of the corporations was "less than minimal," and that they were "shell corporations." UCB entered into the loan agreement in reliance on the individual credit of the defendants and would not have done so but for their individual commitments.

By documents dated May 17, 1967, the negotiations were reduced to writing. The documents were prepared by UCB. The Construction Loan Agreement was between UCB and joint venture. Under it a loan of $1,273,000 would be made by UCB to joint venture secured by a trust deed on the 67 lots. The improvements were to be completed within 180 days from the date the trust deed was recorded. Joint venture was also required to remit to UCB such funds as were required to assure full payment for all of the improvements. The loan was to be disbursed for certain allocated uses: the payment of an existing encumbrance, off-site improvements, actual loan expenses, and the remainder was to be released as construction on the remaining improvements progressed. This agreement also provided that irrespective of provisions in other documents, interest on the loan disbursed was to be 7 percent per annum from the respective date of advancement until 18 months from the date of agreement, and thereafter at a rate of 10 percent.

The promissory note was in the principal amount of $1,273,000, all of which was payable in one lump sum in 18 months. Interest was stated to be payable monthly, at a rate of 7 percent per annum.

By a separate letter dated May 17, 1967, from joint venture to UCB, attached to the Construction Loan Agreement, it was stated that joint venture would improve 30 lots with single family dwellings. Construction

of single family dwellings would not begin on the remaining 37 lots until it was mutually agreed that a satisfactory volume of sales of the first 30 lots had been effected.

Sponsors' Loan Purchase Agreement provided in essence that upon the occurrence of the condition precedent that the joint venture had not completed construction in time or defaulted in any other obligation, sponsors agreed to purchase the loan, which was evidenced in part by the promissory note and deed of trust and the Construction Loan Agreement, by paying UCB the full amount of principal disbursed and interest which had accrued and attorney's fees.

The deed of trust was recorded by UCB on October 2, 1967. Joint venture was delayed in initiating construction because of delay in obtaining a subdivision report from the California Real Estate Division. Off-site construction was started in early 1968. The off-site improvements were completed in the spring of 1969.

On February 6, 1968, Hamer inspected the tract. In a memorandum dated February 8, 1968, Hamer stated that Maltzman and Robertson were urged to delay commencement of on-site construction until the houses were tested for marketability. E. W. Muhsfeld, a vice-president of UCB, shared the concern that the houses would be modest for the price and he was concerned about their marketability.

On September 5, 1968, Hamer, Muhsfeld, Pollack, Robertson and Maltzman met, and UCB was advised that off-site construction costs exceeded the estimates. Joint venture requested an increase in the loan allocated to off-site improvements. Later that month, Maltzman told UCB that $70,000 more was needed. Eventually, UCB proposed that joint venture deposit $40,000 into the loan account, and UCB would release $30,000 from loan funds previously allocated for purposes other than off-site improvements.

Muhsfeld told joint venture that funds would not be disbursed for on-site improvements. But the trial court found that UCB honored every request for disbursement and that joint venture never asked for disbursement for on-site improvements. Joint venture attempted to sell the tract in September 1968, and the court found that the project was abandoned at that time.

By letter dated July 14, 1969, UCB demanded that sponsors immediately purchase the promissory note and deed of trust. By letter dated July

22, 1969, sponsors declared to UCB that sponsors were not obliged to purchase because UCB failed to disburse the needed construction funds. No principal payments were made on the promissory note. Interest was paid through February 1969.

The total funds disbursed were $450,475.16. UCB's witness testified that interest in the amount of $210,599.38 was unpaid as of February 1, 1973. This was computed on the disbursed funds compounded on the delinquent interest at the rate of 7 percent until March 1, 1969, and 10 percent thereafter.

### DISCUSSION

■ Sponsors contend that UCB refused to disburse loan funds earmarked for the on-site construction unless joint venture put up additional capital. Sponsors further argue that such required additional contribution by the joint venture amounted to a material breach of the Construction Loan Agreement. They argue that the additional capital to assure completion of the 67 units was unnecessary since the joint venture could build 30 of the units and use the profits made from the sale as additional capital to assure the completion of the remaining 37 units. Sponsors argue that the UCB requirement that additional capital, needed to offset the increased cost of construction of the first 30 units, be paid in at the time the 30 units were to be built was unreasonable and a breach of the contract.

■ It is solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence. (*Parsons* v. *Bristol Development Co.,* 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) Once the facts are determined, or where there is no conflict in the extrinsic evidence, the interpretation of a contract in the light of those facts is a question of law. (*O'Connor Bros. Abalone Co.* v. *Brando,* 40 Cal.App.3d 90, 95 [114 Cal.Rptr. 773].)

■ Extrinsic evidence is important in interpreting a contract since the practical construction placed upon a contract by the parties before any controversy arises regarding meaning affords one of the most reliable means of determining the intent of the parties. (*Bohman* v. *Berg,* 54 Cal.2d 787, 795 [8 Cal.Rptr. 441, 356 P.2d 185]; *City of Los Angeles* v. *Japan Air Lines Co., Ltd.,* 41 Cal.App.3d 416, 429 [116 Cal.Rptr. 69].)

■ The provision of Construction Loan Agreement upon which UCB relies as justification for the requirement that the joint venture

contribute capital as a condition to the disbursement of the promised loan states that: ". . . Owner [joint venture] shall also . . . remit to Lender [UCB] such amounts as Lender may from time to time require, in addition to such loan funds, to assure full payment for all such improvements."

The trial court found that UCB honored every request for loan disbursement made by joint venture pursuant to the Construction Loan Agreement and at all times was ready, willing and able to perform all of its obligations under the Construction Loan Agreement. Sponsors and joint venture dispute this finding since UCB stated they would not disburse the promised loan unless the joint venture remitted additional capital. This finding is based on an implied finding that the estimated cost of construction of the 30 units was increased and the old cost estimate, upon which the loan was based, had to be revised and any deficiency would have to be supplemented by additional capital from the joint venture before any part of the promised loan for on-site construction would be disbursed. Although the promised loan was allocated to different stages of the construction and no distinction was made in the allocation to the 67 units between the first 30 and next 37 units in the writing, a distinction did exist as evidenced by the conduct of the parties. Sponsors and joint venture in their statement of facts noted that plaintiffs' exhibit 1 and defendants' exhibit A provided that the builder would "first improve with single family dwellings 30 specific lots and would not request funds for on-site improvements for the other 37 lots covered by the deed of trust, nor commence house construction on said 37 lots, until it was mutually agreed that a satisfactory volume of sales of completed houses had been effected as to the first 30 improved lots." Sponsors and joint venture understood this to mean that they could only construct 30 units at first, and were not required to construct the additional 37. We conclude that the trial court could reasonably draw the inference from this substantial evidence of a distinction between the first 30 units and the next 37 units that any increased cost of constructing the first 30 units must be remitted by the joint venture and need not be advanced by the promised loan allocated to the next 37 units. (*Gyerman* v. *United States Lines Co.,* 7 Cal.3d 488, 492, fn. 1 [102 Cal.Rptr. 795, 498 P.2d 1043]; *McCarthy* v. *Tally,* 46 Cal.2d 577, 581 [297 P.2d 981].) Therefore UCB did not breach the Construction Loan Agreement by stating that no loan disbursements would be made unless the joint venture remitted funds sufficient to cover the increased cost of the first 30 units.

██ Sponsors contend that joint venture was not in default and thus

the conditions precedent to the sponsors' objections under the Sponsors' Loan Purchase Agreement did not occur. While it is admitted that joint venture failed to complete the improvements within six months, and that it failed to make timely interest and principal payments on the promissory note, sponsors argue that strict compliance with these provisions had been waived by UCB. It is argued that since UCB did not first make demand for specific performance by joint venture and allow a reasonable time for performance, UCB could not assert the existence of a default.

The trial court did find that UCB waived the requirement that the joint venture complete the improvements within six months of the recording of the deed of trust. The court also found, however, that completion of the improvements had to be within a reasonable time. This was proper even without a demand for performance. The law does not require the performance of a useless act (*Goldberg* v. *Rempp,* 95 Cal.App. 452, 455 [273 P. 63]) and the voluntary abandonment of a contract relieves the obligee of the duty of making a demand (*Walker* v. *Harbor Business Blocks Co.,* 181 Cal. 773, 778 [186 P. 356]). The trial court found that joint venture abandoned any efforts to construct homes on the lots in September 1968. Sponsors and joint venture dispute this finding of fact by arguing that as the record shows, joint venture continued constructing off-site improvements after the date that they were found to have abandoned the project. Such evidence was not conclusive since there was also evidence that the completion of the off-site improvements would put the tract in a salable condition and relieve joint venture of its liability under a county completion bond for the off-site improvements. In light of these facts there was substantial evidence for the trial court's finding that joint venture abandoned the project despite the continued construction of off-site improvements. We conclude that because of the abandonment of the project by the joint venture, the condition precedent that the joint venture be in default occurred and required sponsors to perform under the Sponsors' Loan Purchase Agreement.

In addition to the breach of the Construction Loan Agreement, the failure of the joint venture to pay all interest and the principal due under the promissory note was a default which also was the occurrence of a condition precedent requiring sponsors to perform under the Sponsors' Loan Purchase Agreement. Any waiver of timely payment by accepting late payments was removed when UCB made demand on sponsors to purchase the loan on July 14, 1969. This was clear notice to joint venture that UCB considered the promissory note in default. ■ Knowledge

of an officer of a corporation within the scope of his duties is imputed to the corporation. *Sanders* v. *Magill,* 9 Cal.2d 145, 153 [70 P.2d 159]. While the exact relation of sponsors to joint venture is not entirely clear in the record, it is clear that sponsors were also agents of the joint venturers. Five of the sponsors signed the Construction Loan Agreement for the joint venturer corporations as presidents and secretaries, sponsors were referred to as principals of the deal, and the joint venturer Saymur was described as sponsor Robertson's corporation. There was a reasonable time between the demand for sponsors to perform and the filing of this action in October 1969, which would enable joint venture to pay the interest and principal due under the loan. In failing to repay the loan, joint venture was in default, and we conclude that sponsors were thereupon required to perform the Sponsors' Loan Purchase Agreement.

 Sponsors also contend that UCB failed to tender an assignment of the promissory note and deed of trust to them, and thus sponsors had no obligation to pay UCB the sums demanded. Sponsors contend that such a tender of assignment should have been made by UCB at the time UCB first demanded that sponsors purchase the loan. But the rule of concurrent conditions (Civ. Code, § 1439) does not require a tender of performance in all cases. A party to a contract need not tender performance if the conduct of the other party acts as a waiver or amounts to a refusal to perform in any event, or an abandonment of the contract. *Sausalito etc. Co.* v. *Sausalito Imp. Co.,* 166 Cal. 302, 308 [136 P. 57]. See also, *Hoppin* v. *Munsey,* 185 Cal. 678, 685 [198 P. 398]; *Grimes* v. *Steele,* 56 Cal.App.2d 786, 790 [133 P.2d 874]. Sponsors have resisted purchase of the note and trust deed on several grounds and have by cross-complaint asserted that UCB is liable to them. This evidences a refusal to perform even if a tender of the assignment had been made.

Sponsors contend that such a tender of assignment was required at trial. It is argued that UCB should have deposited these documents in court, and that the court's money judgment should have been expressly conditioned upon the delivery to the sponsors of the assigned note and trust deed. It is true that in *Bank of America etc. Assn.* v. *Lane M. Co.,* 18 Cal.App.2d 431, 444 [63 P.2d 1189], the judgment was conditioned upon the delivery to the defendant of the assigned note and trust deed, which had been deposited in court. But the court did not state this to be an absolute requirement. As in *Sausalito, supra,* at pages 308-309, the trial court held that upon payment of the indebtedness by the sponsors, UCB was obligated to assign to the sponsors the promissory note and deed of trust.

Sponsors contend that they were in fact the principal obligors under the promissory note and that under Code of Civil Procedure section 726 UCB is barred from suing them unless the security for the loan is first exhausted. Sponsors submit that the "one action" rule does not apply to an action brought against a true guarantor of the debt. *Security-First Nat. Bank* v. *Chapman,* 31 Cal.App.2d 182, 186 [87 P.2d 724]. However, sponsors argue that the rationale involved in the anti-deficiency judgment cases (Code Civ. Proc., § 580a et seq.), which have held that purported guarantors who are actually the principal debtors should be protected (see, e.g., *Valinda Builders, Inc.* v. *Bissner,* 230 Cal.App.2d 106 [40 Cal.Rptr. 735]), applies as well to "one action" cases. While the sponsors cite no authority for this contention, this rationale has been applied to Nevada's "one action" statute. *Coombs* v. *Heers* (D.Nev. 1973) 366 F.Supp. 851.

Sponsors contend that if the debtor is the *alter ego* of the guarantor, the guarantor is protected by the "one action" rule. Cf. *Roberts* v. *Graves,* 269 Cal.App.2d 410, 418 [75 Cal.Rptr. 130]; *Valinda Builders, Inc.* v. *Bissner,* 230 Cal.App.2d 106 [40 Cal.Rptr. 735]. The vice of sponsors' argument is that it is predicated on two issues of fact which were resolved against them by the trial court: (1) that sponsors were the principal debtor and not guarantors, and (2) that sponsors were *alter egos* of joint venturers.

We conclude that sponsors may not rely on the "one action" rule. In cases in which the question is raised as to whether or not a corporate entity is actually the *alter ego* of an individual, there is a presumption of separate entity, and the determination of whether the requirements exist for disregarding the corporate entity is primarily one for the trial court and not a question of law. *T W M Homes, Inc.* v. *Atherwood Realty & Inv. Co.,* 214 Cal.App.2d 826 [29 Cal.Rptr. 887]; 15 California Jurisprudence, Second Edition, Corporations, section 20 at pages 67-68. The trial court made findings of fact that the joint venturer corporations were entities distinct and different from any individual parties in this action and that none of the sponsors was even personally liable under the Construction Loan Agreement, promissory note, or deed of trust.

The ultimate answer to sponsors' "one action" argument is that insofar as UCB is concerned it has and will file only one action—the case at bar. If, as and when sponsors satisfy the judgment herein and pay UCB the amount agreed upon, UCB will have no further interest in sponsors, joint venturers or the real property in question. If, as and when sponsors

satisfy the judgment herein, sponsors may, but are not legally required to proceed against joint venturers. This notably is not a case in which a creditor forecloses on the security and then seeks to recover additional sums from additional parties. Here the creditor merely seeks to enforce a contract right to effect an assignment or substitution so that the creditor is removed from the transaction entirely.

 Sponsors contend that if the Sponsors' Loan Purchase Agreement is to be regarded as a true guarantee creating a separate obligation from the secured debt, sponsors were entitled to require UCB to proceed first against the joint venture and the security as a prerequisite to asserting that sponsors are liable, and they argue that they are exonerated to the extent UCB failed to do so. The vice of this argument is that the question of whether or not the Sponsors' Loan Agreement was a subterfuge and should have been regarded as a true guarantee agreement was a question of fact for the trial court. It found otherwise and its finding is supported by substantial evidence. We are bound by that finding.

Furthermore, exoneration is an affirmative defense and is not available unless pleaded. *Alexandrou* v. *Alexander,* 37 Cal.App.3d 306, 315 [112 Cal.Rptr. 307]; *Standard Oil Co.* v. *Houser,* 101 Cal.App.2d 480, 488 [225 P.2d 539]. Even assuming that the second affirmative defense that UCB had a duty to mitigate its alleged damages sufficiently raised this issue, we conclude that the sponsors may not now seek exoneration for the additional reason that the record does not show that a demand that UCB proceed first against the joint venture was ever made.

Under Civil Code section 2845, a surety, and now a guarantor (*Moffett* v. *Miller,* 119 Cal.App.2d 712 [260 P.2d 215]), may require the creditor to proceed against the principal. But as a prerequisite to requiring the creditor to proceed against the principal, demand must be made. *Duerr* v. *Sloan,* 50 Cal.App. 512, 518-519 [195 P. 475]. In the absence of such demand, an action may be maintained against the guarantor. *Developers Small Business Investment Corp.* v. *Hoeckle* (9th Cir. 1968) 395 F.2d 80, 85 footnote 2. It is now too late for the sponsors to require on appeal that UCB proceed first against joint venture.

 Sponsors finally contend that the interest computed by the court to be due was incorrect. Pursuant to the Sponsors' Purchase Loan Agreement, the sponsors were required to purchase the loan (which was evidenced in part by promissory note) for the sum of the principal disbursed, interest accrued and expenses including attorney's fees. The

sponsors contend that the 7 percent interest provided for in the promissory note was the proper rate to be used. However, the loan was also evidenced in part by the Construction Loan Agreement which provided that 7 percent was to be the rate of interest until 18 months from the date of the agreement, and then 10 percent would be charged. The sponsors argue that in the case of this discrepancy it must be construed most strongly against UCB, the party who drafted the documents. (*Graydon-Murphy Oldsmobile* v. *Ohio Cas. Ins. Co.,* 16 Cal.App.3d 53, 57 [93 Cal.Rptr. 684].) But the Construction Loan Agreement provides that the provision as to interest is to apply irrespective of the provisions of the other documents of the loan. Sponsors obligation was to purchase the "loan" (the cause of action for the repayment of money) not any particular piece of paper which might evidence such loan. Therefore, we conclude that no error was committed in charging interest at the rate of 10 percent per annum beginning 18 months from the date of the agreement. Since the joint venturers were legally obligated to pay the higher interest, sponsors became obligated tc do so when they purchased the loan.

Even allowing 10 percent as the rate of interest, the sponsors now contend that the mathematical computation is incorrect. UCB's witness testified that $210,599.38 was unpaid interest as of February 1, 1973. This was computed on the disbursed funds, on a monthly basis, plus interest on the delinquent interest at 7 percent up to March 1, 1969, and 10 percent thereafter. The sponsors did not object to this method of computation or to its result, and offered no other figure. Interest was found to be $224,003.17 at the date of judgment, March 29, 1973. In light of the testimony on computation and the additional time passing until judgment was entered, we conclude that there was sufficient evidence to support the court's award of interest, there being no apparent error in the mathematical computation.

The judgment is affirmed.

Kaus, P. J., and Hastings, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied February 19, 1975. Mosk, J., was of the opinion that the petition should be granted.