[No. A063545. First Dist., Div. Two. June 27, 1994.]

GOLDEN EAGLE INSURANCE COMPANY, Plaintiff and Appellant, v. FIRST NATIONWIDE FINANCIAL CORPORATION, Defendant and Respondent;

[No. A062789. First Dist., Div. Two. June 27, 1994.]

GOLDEN EAGLE INSURANCE COMPANY, Plaintiff and Appellant, v. GDC/BROADMOOR/VALLEJO ASSOCIATES, Defendant and Respondent.

**COUNSEL**

Capps, Staples, Ward, Hastings & Dodson and Michael Mee for Plaintiff and Appellant.

Lillick & Charles, James J. Ficenec and Richard Birnholz for Defendants and Respondents.

Daniel J. Modena and Edmund L. Regalia Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

**POLLAK, J.**\*—These are consolidated appeals from two summary judgments entered in the same action in favor of different parties with identical legal positions. The common issue presented is whether a surety on a construction payment bond who pays the claim of a subcontractor who had perfected a mechanics' lien on the improved property may by subrogation acquire the right to enforce the mechanics' lien against the property. The

---

\*Judge of the San Francisco Superior Court sitting under assignment by the Chairperson of the Judicial Council.

trial court, in granting summary judgment against the surety, concluded that "California law is well-settled that absent fraud by the owner in bringing about the issuance of the surety bonds, a surety who has paid the claims of a lien claimant extinguishes the principal obligation and is entitled to reimbursement from its principal but is not subrogated to the rights of such former lien claimants as against the property."[1] We consider this statement of the law to be overbroad, and reverse the judgments.

## FACTS

This litigation arises out of the same failed real estate development project that was the subject of this court's recent decision in *Vallejo Development Co.* v. *Beck Development Co.* (1994) 24 Cal.App.4th 929 [29 Cal.Rptr.2d 669]. This was a project for the development of approximately 1,200 acres in Vallejo, California, into a planned community to be known as "Northgate." Without tracing the full history of this project, Vallejo Development Company (VDC) by assignment became the master developer of six residentially zoned parcels (referred to as "neighborhoods") which were sold to various "merchant builders." Neighborhood D was sold to the assignor of the respondent in one appeal, First Nationwide Financial Corporation (FN), and Neighborhood F was sold to the assignor of the second respondent, GDC/Broadmoor/Vallejo Associates (GDC). Respondents therefore are the owners of their respective parcels.

Under the agreements between VDC and each of the respondents, VDC was obligated to construct the "infrastructure" of the neighborhoods and respondents agreed to pay VDC upon satisfactory performance of that work. VDC subcontracted the grading work to Ghilotti Bros., Inc. (Ghilotti) and procured statutory payment bonds for the performance of this work from plaintiff and appellant, Golden Eagle Insurance Company (Golden Eagle).[2] Ghilotti performed substantial grading on the properties; work for which VDC neither paid Ghilotti nor was paid by respondents.

When all work on the projects came to a halt in September 1991, Ghilotti instituted a variety of remedial measures, including the filing of mechanics' liens against, among other parcels, respondent FN's Neighborhood D for $1,200,773 and respondent GDC's Neighborhood F for $1,382,226. After Ghilotti had filed suit to enforce the mechanics' liens, Golden Eagle entered into an agreement with Ghilotti dated January 29, 1992, under which Golden

---

[1] This was the reasoning of Judge Bunting in granting summary judgment in favor of GDC/Broadmoor/Vallejo Associates. In granting summary judgment in favor of First Nationwide Financial Corporation, Judge Harrison ruled simply that "[A]s a matter of law, the principle of equitable subrogation does not apply to the facts presented by this case."

[2] The bonds were in the form specified in Government Code section 66499.2.

Eagle agreed to pay Ghilotti a total of $3,023,020, and Ghilotti agreed to release Golden Eagle from all liability under its surety bonds and to assign to Golden Eagle its mechanics' lien rights with respect to Neighborhood D and Neighborhood F. Two days later, Ghilotti did execute an unconditional waiver and release of payment bond rights upon payment and an indemnification agreement, in which it did "fully compromise and settle any and all liability or indebtedness" which Ghilotti had against Golden Eagle or VDC arising out of the surety bonds; about one month later it executed a formal "Assignment of Claim of Lien," purporting to assign its mechanics' lien rights to Golden Eagle pursuant to the terms of the January 1992 agreement.

Golden Eagle subsequently substituted itself in as the plaintiff in the actions to enforce the mechanics' liens which Ghilotti had earlier filed, alleging its right to enforce the liens as the assignee from Ghilotti. Thereafter, respondents successfully moved for summary judgment. These appeals were timely taken from the judgments dismissing Golden Eagle's amended complaint.

## DISCUSSION

1. *Golden Eagle Acquired No Right to Enforce the Mechanics' Liens by Virtue of the Assignments.*

Golden Eagle first contends that summary judgment was improper because its payment to Ghilotti did not extinguish Ghilotti's claim for payment, as the trial court held, but called for the assignment of Ghilotti's claim to Golden Eagle. At a minimum, appellant contends, there was a triable issue of fact as to whether Golden Eagle's payment was in exchange for the release or for the assignment of the underlying claim. The dichotomy on which Golden Eagle relies traces back to *Merner Lumber Co.* v. *Brown* (1933) 218 Cal. 136 [21 P.2d 590]. There, under closely analogous circumstances, ·the California Supreme Court restated the "well-settled law in this state that when a surety pays a debt for which he is liable as such surety, he thereby extinguishes the debt and his remedy is against the principal upon the implied obligation of the principal to reimburse him."[3] (218 Cal. at p. 140.) In responding to the surety's argument that the evidence in that case reflected a purchase, rather than a payment, of the underlying claim, the court observed: "The surety either paid these claims or it purchased them

---

[3]This proposition in turn may be traced to a 19th century English decision and to decisions of the California courts interpreting section 1473 of the Civil Code ("Full performance of an obligation . . . if accepted by the creditor, extinguishes it."). (See Note (1929) 17 Cal.L.Rev. 281, 283-285.) For subsequent restatements of this general rule, see, e.g., *Regents of University of California* v. *Hartford Acc. & Indem. Co.* (1978) 21 Cal.3d 624, 637 [147 Cal.Rptr. 486, 581 P.2d 197]; *Berrington* v. *Williams* (1966) 244 Cal.App.2d 130, 134 [52 Cal.Rptr. 772].

from the two lumber companies. It could not do both. If it paid them, it could not have bought them, for upon their payment they were extinguished and there was then nothing to purchase. On the other hand, if it bought the claims it could not thereafter pay them without paying itself and this it does not claim to have done." (*Merner Lumber Co.* v. *Brown, supra,* 218 Cal. at p. 140.)

The court there found that the record supported the trial court's finding that the surety had in fact paid and therefore discharged the debt, so that there was no claim for it to pursue by virtue of the purported assignment.

The distinction that the Supreme Court drew in *Merner* between payment and purchase is somewhat ephemeral and, as can be discerned from that very decision, not particularly significant. There, as in the present case, the uncontradicted evidence established that the surety fully paid the materialmen and at the same time took back a purported assignment of the underlying claims. Other than for possible testimony concerning the subjective intentions or motivations of the participants—irrelevant under basic principles of contract interpretation—there was nothing to be added to the terms of the agreement.[4] Whether payment of the lienors' claims under these circumstances discharges the claims is a question of law. There was thus no factual controversy in the present case precluding summary judgment.

While the Supreme Court in *Merner* held that the surety could not enforce the lienors' claims by virtue of the purported assignment, it did acknowledge the potential for a subrogation claim. The court went on explicitly to "assume" that the surety, "by paying the two lien claimants, was subrogated to all rights of these claimants to foreclose their respective liens." (218 Cal. at p. 142.) The court held, however, that since the property owner already had paid the full contract price for the improvements made by the lien claimants, it would have been inequitable to have permitted the surety, as their subrogee, to enforce the mechanics' liens. Since the owner had already

---

[4]In *Merner,* the court only "assum[ed] . . . that there was a conflict in the evidence as to whether the claims were paid or whether they were purchased by the surety company." (218 Cal. at p. 140.) Apparently the only basis for this assumption was testimony that the surety had taken an assignment of the claims. While the Supreme Court held that "the evidence of payment was sufficient to support the finding of the court that the surety company paid and discharged the claims in full" (*ibid.*), it did not hold that this evidence would have been sufficient to support a finding that the lien claims had in fact been purchased, entitling the surety as assignee of the claims to pursue those claims without regard to the limitations that apply to equitable subrogation.

In *Johnson* v. *Mortgage Guarantee Co.* (1931) 117 Cal.App. 416, 420-421 [4 P.2d 208], the Court of Appeal upheld a finding that a surety on a payment bond had purchased, rather than paid for and extinguished, a promissory note given by the contractor to a materialman for materials used on a construction project. However, the court also pointed out that even if the surety had paid the debt, he would then have been entitled to assert a subrogated claim to the materialman's security interest in the property securing the note. (*Id.,* at p. 421.)

paid for the improvements, requiring it to pay a second time for the same work would hardly have been equitable.

■ *Merner* implicitly established that the rights which the surety acquires when making payment under a statutory payment bond are defined not by the terms of any assignment it may take back but by the equitable doctrine of subrogation. "[A]ssignment of an assignable cause of action is but one of the recognized forms of subrogation, and . . . when one is entitled to substitution in the place of one entitled to institute and to maintain an action, neither a written, nor an oral contract, is necessary to effect a transfer of such right. . . ." (*Meyers* v. *Bank of America etc. Assn.* (1938) 11 Cal.2d 92, 94 [77 P.2d 1084].)

"[T]he conclusion seems inevitable that one who asserts a right of subrogation, whether by virtue of an assignment or otherwise, must first show a *right in equity* to be entitled to such subrogation, or substitution, and that where such right is clearly shown by the application of equitable principles, an assignment adds nothing to his right thereto. Otherwise stated, where by the application of equitable principles, a surety has been found not to be entitled to subrogation, an assignment will not confer upon him the right to be so substituted in an action at law upon the assignment. His rights must be measured by the application of equitable principles in the first instance, his recovery being dependable upon a right in equity, and not by virtue of an asserted legal right under an assignment." (11 Cal.2d at pp. 96-97; see also, e.g., *Fidelity & Deposit Co. of Maryland* v. *De Strajman* (1963) 215 Cal.App.2d 10, 12 [29 Cal.Rptr. 855].) Thus, whether or not there is a formal assignment, the nature and extent of the rights against third parties of the surety who pays a mechanics' lien claim are determined by the law of subrogation.

2. *The Applicable Provisions of the Civil Code Do Not Restrict the Right of Subrogation.*

Respondents contend that Golden Eagle's attempt to enforce the mechanics' liens is barred by Civil Code section 2847, which provides as follows:

"If a surety satisfies the principal obligation, or any part thereof, whether with or without legal proceedings, the principal is bound to reimburse what he has disbursed including necessary costs and expenses; but the surety has no claim for reimbursement against other persons, though they may have been benefited by his act, except as prescribed by the next section."[5]

Golden Eagle, on the other hand, contends that Civil Code section 2849 (further undesignated cites are to this code) recognizes its right to enforce the mechanics' liens. Section 2849 reads: "A surety is entitled to the benefit

---

[5]Civil Code section 2848 reads as follows: "A surety, upon satisfying the obligation of the principal, is entitled to enforce every remedy which the creditor then has against the principal

of every security for the performance of the principal obligation held by the creditor, or by a co-surety at the time of entering into the contract of suretyship, or acquired by him afterwards, whether the surety was aware of the security or not."

The parties disagree whether a mechanics' lien should be viewed as "security for the performance of the principal obligation" held by a subcontractor within the meaning of section 2849. ■ Be that as it may, section 2847 does not preclude the assertion of a claim acquired by subrogation. The right to reimbursement which section 2847 limits is the right—implied by law even if not included in the suretyship agreement—to be repaid by the principal for the amount which the surety has advanced to satisfy an obligation for which the principal was primarily responsible. "The primary remedy that the surety can actually invoke against the principal is a suit based on the implied obligation of reimbursement." (*Regents of University of California* v. *Hartford Acc. & Indem. Co., supra*, 21 Cal.3d at p. 638.) It is "a new cause of action, arising only when the surety pays the creditor . . . ." (*Ibid.*; *Berrington* v. *Williams, supra*, 244 Cal.App.2d at p. 134.) Only the principal on whose behalf the payment is made is responsible to reimburse the surety, as section 2847 confirms.

The claim which Golden Eagle is seeking to enforce against the property owners is not for reimbursement. It is, instead, a claim acquired by subrogation for payment for the grading work performed by Ghilotti. Analytically, the two claims are distinct and subject to different conditions and restrictions. "Subrogation in California suretyship law thus is not the surety's primary remedy for recourse against the principal; it refers instead to a variety of rights which the surety may assert against third parties, cosureties, and property . . . ." (21 Cal.3d at p. 637; see also, e.g., *Berrington* v. *Williams, supra*, 244 Cal.App.2d at pp. 134-135; *W. H. Marston Co.* v. *Kochritz* (1930) 109 Cal.App. 331 [293 P. 120]; cf. *Fireman's etc. Co.* v. *State Comp. etc. Fund* (1949) 93 Cal.App.2d 408, 411-412 [209 P.2d 55] [distinguishing contribution from subrogation].) Section 2847 thus imposes no restriction on the assertion of Golden Eagle's subrogated claim. (*Commercial Standard Ins. Co.* v. *Bank of America* (1976) 57 Cal.App.3d 241, 247 [129 Cal.Rptr. 91]; *Filippi* v. *McMartin* (1961) 188 Cal.App.2d 135, 140 [10 Cal.Rptr. 180].)

Respondents argue in the alternative that any remedies Golden Eagle may have against their property were waived by Golden Eagle's failure to exercise its rights under section 2845, which reads:

to the extent of reimbursing what he has expended, and also to require all his co-sureties to contribute thereto, without regard to the order of time in which he became such."

"A surety may require the creditor . . . to proceed against the principal, or to pursue any other remedy in the creditor's power which the surety cannot pursue, and which would lighten the surety's burden; and if the creditor neglects to do so, the surety is exonerated to the extent to which the surety is thereby prejudiced."

Citing *Sukut-Coulson, Inc.* v. *Allied Canon Co.* (1978) 85 Cal.App.3d 648, 655 [149 Cal.Rptr. 711], respondents contend that a surety's failure to require a subcontractor to enforce a mechanics' lien held by the subcontractor constitutes a waiver of any right to subrogation that the surety otherwise might have. The court in *Sukut-Coulson*, however, did not interpret section 2845 to impose any duty on the surety to insist that the creditor pursue its other remedies. The court held only that under section 2845, a surety must make a formal demand upon the creditor before the creditor becomes obligated to enforce its other remedies. This conclusion is in accord with earlier decisions (*Glickman* v. *Collins* (1975) 13 Cal.3d 852, 862 [120 Cal.Rptr. 76, 533 P.2d 204, 93 A.L.R.3d 513]; *United California Bank* v. *Maltzman* (1974) 44 Cal.App.3d 41, 54 [118 Cal.Rptr. 299]), and provides no basis to defeat the assertion of a subrogated claim when the surety honors its obligations to the a subcontractor without demanding that the subcontractor first enforce its lien rights.

3. *A Surety Who Pays the Debt of Its Principal May Be Subrogated to the Rights of the Creditor.*

■ Payment of a principal's debt by a surety is the prototypical situation in which the equitable right to subrogation arises. "Subrogation is the right to recover from the *debtor-obligor*. A surety, e.g., pays the principal debtor's obligation to the creditor, and in equity is substituted for the creditor, or *subrogated* to his rights against the debtor." (11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 169, p. 848, italics in original.)

■ The prerequisites to the assertion of a right of subrogation are these: " '(1) Payment must have been made by the subrogee to protect his own interest. (2) The subrogee must not have acted as a volunteer. (3) The debt paid must be one for which the subrogee was not primarily liable. (4) The entire debt must have been paid. (5) Subrogation must not work any injustice to the rights of others.' " (*Caito* v. *United California Bank* (1978) 20 Cal.3d 694, 704 [144 Cal.Rptr. 751, 576 P.2d 466]; see also *Grant* v. *de Otte* (1954) 122 Cal.App.2d 724, 728 [265 P.2d 952]; 11 Witkin, Summary of Cal. Law, *supra*, § 169, at p. 849.)

Respondents contend that in this case the third requirement has not been met, in that the surety is primarily liable on the payment bond. They rely on

cases which have held that a payment bond is "not a true suretyship" because the surety is directly liable to materialmen and laborers. (*Bonded Prod. Co. v. R. C. Gallyon Constr. Co., Inc.* (1964) 228 Cal.App.2d 186, 190-191 [39 Cal.Rptr. 347]; *Powers Regulator Co.* v. *Seaboard Surety Co.* (1962) 204 Cal.App.2d 338, 349-350 [22 Cal.Rptr. 373].) These cases have held that a subcontractor's waiver of rights against the principal does not preclude recovery against the surety because "the bond did not create the secondary liability of a surety . . . , but a primary obligation of the surety company." (*Powers Regulator Co., supra,* 204 Cal.App.2d at p. 350; cf. *Regents of University of California* v. *Hartford Acc. & Indem. Co., supra,* 21 Cal.3d 624 [running of statute of limitations on claim against principal does not bar assertion of claim against surety].) However, while the surety's obligations to the beneficiaries of the bond may be primary in the sense of being subject to a direct right of action which is not subject to defenses available to the principal, they are secondary in the sense that the underlying payment obligation is derived from an obligation owed by the principal, who in turn is obligated to reimburse the surety for payments made under the bond. (§ 2847; see Marsh & Marsh, Cal. Mechanics' Lien Law (1993) § 11.4.)

Neither *Bonded Products* nor *Powers Regulator* involved subrogated claims. Numerous cases, however, have recognized the right of the surety on a payment bond to be subrogated to the claims of subcontractors, materialmen and laborers whose claims it satisfies. (E.g., *Pacific Employers Ins. Co.* v. *State of California* (1970) 3 Cal.3d 573, 576 [91 Cal.Rptr. 273, 477 P.2d 129]; *Leatherby Ins. Co.* v. *City of Tustin* (1977) 76 Cal.App.3d 678, 685 [143 Cal.Rptr. 153]; *United States Fid. and Guar.* v. *Oak Grove Union School Dist.* (1962) 205 Cal.App.2d 226 [22 Cal.Rptr. 907]; *American Surety Co.* v. *City of Santa Barbara* (9th Cir. 1932) 56 F.2d 769.) While the fact that these cases involved subrogated claims to enforce rights under statutory stop notices, rather than to enforce mechanics' liens, may be relevant to distinguish the decisions on other grounds, the cases nonetheless stand for the proposition that the claims of a payment bond surety are not primary in any respect that defeats the right to subrogation. (See also, *Sukut-Coulson, Inc.* v. *Allied Canon Co., supra,* 85 Cal.App.3d 648, 654-655 [recognizing both that surety has primary and direct obligation to subcontractors and materialmen, and that it may be subrogated to mechanics' liens of materialmen].)

*4. In This Case Subrogation Would Not Work an Injustice on the Rights of Others.*

The proper focal point of inquiry in the present case is the fifth requisite for the assertion of a subrogation claim: Would subrogation, in this

instance, "work any injustice to the rights of others"? The trial court's statement of the rationale for granting summary judgment was drawn from *Fillipi* v. *Martin, supra,* 188 Cal.App.2d at page 139, where the Court of Appeal stated: "It is likewise settled that absent an owner's fraud in bringing about the issuance of the bond, a surety who has paid the claims of the valid lien claimants is subrogated to the rights of such former lien claimants as against the principal but not as against the property."

In *Fillipi* the owner of the property and the contractor were found to have fraudulently induced the issuance of the bonds, so that subrogation was permitted. Thus, the exception noted in the opinion for "an owner's fraud" was sufficient to encompass the facts in that case. However, the court there had no occasion to consider other circumstances in which subrogation might be available. Respondents' contention that because Golden Eagle has acknowledged there was no fraud in this case, it necessarily follows that Golden Eagle may not be subrogated to the lien claims, must be rejected as too narrowly limiting the right of subrogation.

■ A more balanced statement is that the right of subrogation "may be invoked against a third party only if he is guilty of some wrongful conduct which makes his equity inferior to that of plaintiff." (11 Witkin, Summary of Cal. Law, *supra,* Equity, § 172, at p. 853; *Jones* v. *Bank of America* (1942) 49 Cal.App.2d 115, 123 [121 P.2d 94].) This is the so-called "doctrine of superior equities." (*Continental Ins. Co.* v. *Morgan, Olmstead, Kennedy & Gardner, Inc.* (1978) 83 Cal.App.3d 593, 602 [148 Cal.Rptr. 57]; *Meyers* v. *Bank of America, supra,* 11 Cal.2d at pp. 98, 102-103.) Under this doctrine, the fault of the third person which creates the superior equity in the surety must be "related to the 'primary cause' of the loss." (*Id.,* at pp. 603-604.) An owner's fraud in inducing issuance of a payment bond is but one instance of the more general rule recognizing a right of subrogation against third parties. It is not the only instance.

With the proper standard in mind, one can readily understand the contrasting adjectives used by the respective parties. Throughout, respondents refer to themselves as "innocent third parties," while Golden Eagle labels them as wrongdoers, seeking to gain a windfall by avoiding their obligation to pay for the improvements to their property. If respondents have fully satisfied their contractual obligations to pay for the work in question—as the owner had done in *Merner*—then they have committed no wrong and permitting subrogation would inequitably subject them to double payment in order to free their property of the lien against it. It is in this respect that respondents properly distinguish the cases which have allowed a surety to assert subrogated claims for construction funds being withheld by the owner or lender

pursuant to a statutory stop notice. (*Pacific Employers Ins. Co.* v. *State of California, supra; Leatherby Insurance Co.* v. *City of Tustin, supra,* 76 Cal.App.3d 678.) The stop notice "reaches only funds otherwise payable to the contractor," (*Leatherby,* 76 Cal.App.3d at p. 688), so that recognition of the subrogated claim in that context gives rise to no risk of double payment. The fact that the surety may by subrogation enforce the stop notice claim therefore does not, as Golden Eagle's argument suggests, compel the conclusion that the surety may also enforce a subrogated mechanics' lien claim when doing so would lead to such an inequitable result.[6]

 Nonetheless, if the facts were as Golden Eagle implies, the equities would be very different. If respondents had indeed breached a contractual obligation to pay VDC for the grading work, the respondents would hardly be "innocent" parties. Such a failure to pay VDC undoubtedly would have been causally related to VDC's failure to pay the subcontractor, Ghilotti, justifying assertion of the subrogated claims. (*Continental Ins. Co.* v. *Morgan, Olmstead, Kennedy & Gardner, Inc., supra,* 83 Cal.App.3d 593.) Under those circumstances, recognition of the subrogated claims would be supported by analogy to the stop notice cases. Permitting the surety to enforce the mechanics' lien to the extent of the outstanding balance that remains due from the owner for the performance of the underlying work would to that extent provide the surety with repayment to which it is entitled, and would work no injustice to the rights of the property owner.

The decision in *United States Fid. & Guar. Co.* v. *Oak Grove Union School Dist., supra,* provides especially strong support for this conclusion. There, the public agency owner had paid the contractor, but had done so prematurely in disregard of a timely stop notice. Despite the prospect of a double payment by the public agency, the surety was held to be subrogated to the claims against it under the stop notice filed by laborers and materialmen whom the surety paid under the payment bond. Comparing those facts to the fraud in *Filippi* v. *Martin,* the court observed: "While, of course, in our case there is no intimation of fraud, nevertheless the same principle must necessarily apply to a situation where . . . the owner completely disregards the stop notices, even though doing so unintentionally. If the surety pays the subcontractors thereafter it is subrogated to the subcontractors' rights." (205 Cal.App.2d at p. 233.) The court went on to observe: "To allow the public agency to pay a contractor after stop notice and then say that because of this, the funds were gone as well as the right to recover against the public agency,

---

[6]Moreover, as brought out by an amicus curiae brief filed on behalf of an owner of two other neighborhoods of the Northgate development, in still other litigation Golden Eagle is pursuing claims against the successor to the construction lender to recover construction funds pursuant to certain "set-aside" letters issued by the lender.

leaving only a hollow right of recovery against a misfeasant public official or the defaulting contractor, is to completely strip any relevant value from the stop notice procedure and from the right of subrogation. Defendant's contention would make the right of subrogation very hollow, indeed, for the surety would be in the position of having no assurance that whatever contract funds remained would be available to mitigate its liability for labor and material." (*Id.* at pp. 233-234.)

*Oak Grove* thus emphasized the importance of the surety's claim to recourse out of remaining construction funds. The interest of the surety is no less when it seeks to enforce a subrogated mechanics' lien claim and funds remain payable under the construction contract. If an obligation of the owner remains outstanding out of which the surety can be satisfied without prejudicing the rights of any other party, there is even less reason to permit the owner to avoid that obligation than there was in *Oak Grove* to require the owner whose initial payment was premature to pay a second time. Recognizing the surety's right to enforce by subrogation a perfected mechanics' lien to the extent of any contract funds that remain unpaid is thus consistent with the equitable principles of subrogation.

Golden Eagle's right to assert the subrogated lien claims in this case therefore cannot be determined without considering whether respondents remain obligated to pay for the work upon which those claims are based. In moving for summary judgment, neither respondent made any attempt to negate such an obligation. Other than for unsupported conflicting contentions concerning the sufficiency of VDC's performance, the record fails to establish either that respondents are, or are not, in breach of any outstanding payment obligations for the work in question. The propriety of the summary judgments therefore turns upon which party had the burden of coming forward with this evidence.

Had Golden Eagle clearly alleged in its amended complaint that it was subrogated to the claims of Ghilotti, the burden would have been on the respondents. As the party seeking summary judgment, respondents had the burden of showing "that one or more elements of the cause of action . . . cannot be established." (Code Civ. Proc., § 437c, subd. (n)(2).) Since, for the reasons discussed above, respondents' contention that the surety's claim is primary does not defeat the subrogation claim, they would be entitled to summary judgment only by negating another element of Golden Eagle's claim. Here, that would have required establishing that the subrogation would work an injustice to the property owners—and this would have required a showing that the property owners have satisfied their obligation to pay for the improvements. As indicated, they have made no effort to do so.

A defendant seeking summary judgment is not required to negate claims which have not been pleaded. (*Joslin* v. *Marin Mun. Water Dist.* (1967) 67 Cal.2d 132, 148-149 [60 Cal.Rptr. 377, 429 P.2d 889]; *580 Folsom Associates* v. *Prometheus Development Co.* (1990) 223 Cal.App.3d 1, 18 [272 Cal.Rptr. 227].) Golden Eagle's amended complaint made no reference to subrogation, but pleaded a right to assert Ghilotti's claim for payment based solely upon the purported assignment it took back from Ghilotti. However, under *Merner*, the mere assignment of Ghilotti's claims did not provide a sufficient predicate for Golden Eagle to sue upon them. (See above.) Thus, the granting of summary judgment arguably might be upheld on the ground that respondents had no need to negate the right to subrogation since none had been pleaded. We decline to rely on this ground, however, since despite the omission from the amended complaint, no one was misled by this easily correctable deficiency. In the trial court as before this court, all parties have addressed the subrogation issue, and both trial judges referred to the doctrine of subrogation in granting the motions for summary judgment. Thus, respondents should not retain their summary judgments unless they have successfully negated Golden Eagle's right to assert the subrogated Ghilotti claims.

Although not initially addressed by any of the parties, there is an additional ground that may be advanced for upholding the summary judgments. In the appeal referred to at the beginning of this opinion, this court has affirmed a judgment dismissing VDC's complaints against several of the merchant builders for recovery of the amounts which allegedly remain due for improvements to the Northgate development. (*Vallejo Development Co.* v. *Beck Development Co., supra,* 24 Cal.App.4th 929.) The dismissal was based on the ground that VDC was not entitled to pursue its claims for additional compensation because at the time the work was performed it did not have a valid contractor's license as required by section 7031, subdivision (a), of the California Business and Professions Code. While this judgment was not based upon an evaluation of the conflicting positions concerning the adequacy of VDC's performance, for reasons of public policy embraced by the Legislature in Business and Professions Code section 7031 and explained in this court's earlier opinion, it has been established that respondents are not legally obligated to make any additional payments to VDC for the work performed by their subcontractors, including Ghilotti.

Since Ghilotti was a duly licensed subcontractor and not in pari delicto with VDC, Ghilotti would have been entitled to enforce its mechanics' liens despite the fact that VDC, the general contractor, is precluded from collecting for lack of a general contractor's license. (Cal. Mechanics' Liens and Other Remedies (Cont.Ed.Bar 2d ed.) § 1.27, p. 19; *Lewis & Queen* v.

*N. M. Ball Sons* (1957) 48 Cal.2d 141, 152-154 [308 P.2d 713].) But regardless of the rights of the subcontractor, the fact that the owner bears no further obligation to the general contractor with whom it contracted for performance of the work arguably should weigh in respondents' favor in measuring the equities to determine the surety's right to enforce the mechanics' lien by subrogation. Respondents' failure to pay VDC cannot be faulted when it has now been adjudicated that respondents have no obligation to make such payment. Permitting Golden Eagle to prosecute the subrogated claims of the subcontractor would, the argument runs, require the property owners to make a payment they are not otherwise obligated to make in order to free Golden Eagle from the burdens it assumed for compensation when it issued the payment bonds. Additionally, nonrecognition of the subrogated claim would tend to support the public policy objectives which underlay this court's decision in *Vallejo Development Co.* v. *Beck Development Co., supra,* since nonrecognition would encourage sureties to insist that a contractor for whom it issues a payment bond is fully licensed.

Nonetheless, we find several reasons for which the equities favor permitting Golden Eagle to pursue the subrogated claims. While respondents are fully entitled to withhold payment from VDC because VDC did not hold a contractor's license, the fact remains that respondents' property has been improved and, so far as the record discloses, they have not paid the amount they agreed to pay for the performance of that work. It may be necessary to confer a windfall upon the owner of improved property in order to enforce the licensing statute against a contractor who violates its provisions, but it is not necessary to confer that same windfall at the expense of either a licensed subcontractor which has performed the work or the surety which has advanced payment to the subcontractor. Permitting the surety to enforce the subrogated claim will not require the owner to pay any amount that it would not have been obligated to pay under the prime contract. If there were deficiencies in performance that reduced or eliminated the amount owed, they will be available as a defense to the subrogated claim. However, if the owner has not paid the agreed price for the improvements that were made to its property, there is no reason why the surety should be compelled to absorb the cost of those improvements. While the surety received a fee for accepting this risk, the surety's rate structure will depend on the magnitude of the risk which it assumed, and there is no good reason why the risk should encompass the possibility of an avoidable windfall to the property owner.

The refusal to permit the surety to assert the subrogated claim of the subcontractor would provide sureties with an additional incentive to ensure that any contractor for whom they issue a performance bond is duly licensed. However, this additional encouragement is not necessary since adequate

incentive to insist on compliance is provided by the surety's inability to assert the claims of the unlicensed contractor. Here, because of the licensing violation, Golden Eagle has been precluded from using equitable subrogation to assert the claims of its principal, VDC, against respondents.

Finally, further consideration of Civil Code section 2845 provides a particularly compelling reason for treating the surety's equitable position as paramount. When VDC failed to pay its subcontractor, Ghilotti, Golden Eagle promptly honored its obligation under the payment bond. Golden Eagle did not delay its payment by demanding that Ghilotti first foreclose on its mechanics' liens, as it conceivably might have done, relying on section 2845. To its credit, Golden Eagle instead paid Ghilotti and assumed the burden of enforcing the mechanics' liens. Were Golden Eagle not entitled to enforce the lien claims, the only means by which a surety could protect against an owner's refusal to pay for the work performed would be to invoke section 2845 and insist that the subcontractor enforce the mechanics' liens before payment was made on the bond. This result would encourage surety companies to engage in conduct which should be strongly discouraged, and would deprive laborers, materialmen and subcontractors of much of the benefit of the payment bond: prompt payment, without the additional expense of litigation, when payment is most needed. And, it should be noted, this approach would not benefit the property owner, since the consequences of foreclosure of the mechanics' lien are no less if pursued by the subcontractor rather than by the surety.

Thus, permitting the surety to assert the subrogated claims in this case will not work an injustice of any sort. To the contrary, Golden Eagle acted responsibly when it paid Ghilotti's claims and accepted the burdens of enforcing the mechanics' liens. It should not be penalized for having done so.

## CONCLUSION

Since respondents failed to negate Golden Eagle's right to assert the subrogated claims of Ghilotti, summary judgment should have been denied. The judgments appealed from are reversed.

Kline, P. J., and Phelan, J., concurred.